# Exhibit B

Case 1:07-cv-03752-LTS-KNF    Document 16-3    Filed 07/16/2007    Page 1 of 17

Alan Kanzer (AK 5839)
Amber C. Wessels (AW 2322)
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
(212) 210-9400

*Attorneys for Plaintiff Sonopress GmbH*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SONOPRESS GmbH,** <br><br> **Plaintiff,** <br><br> v. <br><br> **METRO-GOLDWYN-MAYER HOME ENTERTAINMENT LLC,** <br><br> **Defendant.** | **Case No.** <br><br> <u>**(PROPOSED)**</u> <br> <u>**FIRST AMENDED COMPLAINT**</u> |

Plaintiff Sonopress GmbH ("Sonopress" or "Plaintiff"), by and through its attorneys, Alston & Bird LLP, files this <u>First Amended</u> Complaint against Defendant Metro-Goldwyn-Mayer Home Entertainment LLC, which is also known as MGM Home Entertainment LLC ("MGM" or "Defendant"), and in support thereof, alleges as follows:

**I.    Introduction**

1.    Plaintiff Sonopress is a German GmbH (a limited liability corporation) with its principal place of business and headquarters located in Gütersloh, Federal Republic of Germany ("Germany"). It is part of the Bertelsmann group of companies, which includes Random House (the leading global book publisher), Sony-BMG (a major music label in which Bertelsmann and Sony are equal joint venturers), RTL (the largest European broadcaster), and arvato AG (a

leading provider of distribution, warehousing, printing, storage media manufacturing and various other services). Sonopress is a major player in the business of replicating DVDs.

2. Defendant MGM, a subsidiary of Metro-Goldwyn-Mayer, is a Delaware corporation with its principal place of business in Santa Monica, California. It controls the world's largest library of modern films, comprising more than 4,000 titles, and over 10,400 episodes of television programming.

3. Sonopress is seeking damages and indemnification for MGM's intentional and willful breach of the terms of the Replication Agreement the parties entered into in ~~May~~July 2005 (the "Agreement") for the replication, packaging, and related services and materials for 120 million DVD units over five years.

4. In the event that this Court determines that neither breach of the Agreement nor anticipatory breach of the Agreement has yet occurred, Sonopress seeks declaratory judgment pursuant to 28 USC §2201 and Fed. R. Civ. P. 57 to establish that MGM has an obligation to order <u>a total of</u> 120 million DVD units from Sonopress<u>, and for ancillary relief</u>.

## II.    Jurisdiction and Venue

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs and complete diversity of citizenship exists between the parties. This Court also has jurisdiction over this action pursuant to 28 USC §2201 and Fed. R. Civ. P. 57.

2. Defendant is subject to personal jurisdiction because: (a) in paragraph 22(e) of the Agreement MGM submitted to the jurisdiction of this Court; (b) Defendant conducts substantial business in New York; (c) Defendant has qualified to do business in New York; and (d) Defendant has appointed an agent in New York for service of process.

3.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(a) because paragraph 22(e) of the Agreement contains a forum selection clause that expressly designates this District as the exclusive venue for "any legal proceeding arising out of or relating to this Agreement or its alleged breach".

### III.     Facts Applicable to All Causes of Action

**A.     MGM's Prior Dealings With Arvato**

2.      On or about August 12, 2004, Sonopress's affiliate, arvato distribution GmbH ("arvato distribution"), entered into a Distribution Services Agreement (the "DSA") with MGM, pursuant to which arvato distribution was to provide distribution services to MGM on an exclusive basis in France, the United Kingdom and Germany, through December 31, 2006.

3.      However, Sony Corporation, together with Comcast and a consortium of private equity investors (collectively, "Sony"), bought MGM's parent company, Metro-Goldwyn-Mayer, in a deal announced in September 2004 and finalized in April 2005. MGM and Sony decided to move distribution under the DSA from arvato distribution to Sony Pictures Entertainment ("SPE"); indeed, Sony's April 8, 2005 press release announcing the completion of the Metro-Goldwyn-Mayer acquisition noted that SPE would be assuming distribution responsibilities for Metro-Goldwyn-Mayer.

**A.     MGM's Negotiation and Entry into the Agreement**

4.      On May 3, 2005, MGM sent a memorandum to Sonopress discussing three alternative methods of resolving the early termination of the DSA. MGM considered but rejected paying arvato distribution immediate cash compensation for the early termination, noting that MGM had seen arvato distribution's estimated damages calculation of 14 million Euro and

3

believed that an estimate between 7 and 9 million Euro was "more realistic". MGM also considered but rejected the alternative of continuing to do business with arvato distribution.

5. Instead, MGM chose – in order "to eliminate the compensation payment from NewCo/MGM to arvato [distribution]" – "to replace the balance of the commitment made by MGM to arvato [distribution] for distribution services by a **commitment** on manufacturing services made by NewCo/MGM to Sonopress." <u>MGM had previously agreed to order from Sonopress the replication of 10 million DVD units in each of 2005 and 2006.</u> It therefore <u>now</u> **committed** "to manufacture with Sonopress 100MM DVD units, in addition to the 10MM units **committed** for [each of] 2005 and 2006" with arvato distribution under the DSA. (Emphases added.)

6. As MGM recognized in its own internal memorandum of May 11, 2005 – which was also shared with Sonopress – the pricing for the DVD units provided under the Agreement "includes a compensation element of 0.09 Euro per disc to offset the early termination costs of the distribution agreement with arvato [distribution]." The memorandum elsewhere characterized as "unlikely" the possibility that MGM would fail to order the committed number of DVD units by the end of 2009, and noted that "a mechanism remains to be agreed to should MGM fail to order 120 million" DVD units by then.

7. The Agreement therefore provided a means for MGM to discount the damage payable to arvato distribution from 14 to 9 million Euro, and to repay the 9 million Euro in damages, 0.09 Euro per DVD unit at a time, starting after the delivery of the first 20 million DVD units. This 0.09 Euro per DVD unit was to be passed on by Sonopress to arvato distribution as compensation <u>for the premature termination of the DSA</u>.

A.  **The Terms of the Agreement**

4

8. The Agreement was entered into in ~~the middle of May~~July 2005 and is dated as of January 1, 2005. In this Agreement, MGM and Sonopress defined a "Guaranteed Quantity" of 120 million DVD units and agreed on a worldwide non-exclusive territory.

9. The parties further agreed that MGM would, on a semi-annual basis, provide Sonopress with a rolling forecast of the anticipated number of DVD units to be replicated over the following twelve months.

10. Pursuant to Exhibit A of the Agreement, which sets forth pricing for DVD units provided under the Agreement, Sonopress charges MGM for mastering, disc replication, softbox, assembly service, and print production. The prices per finished item provided are dependent on each of these factors, and range from 0.505 ~~€~~Euro to approximately 5.92 ~~€~~Euro.

11. In addition, in the event that MGM, beginning in 2007, obtained ~~a~~ bona fide lower ~~bid~~bids from Sonopress's competitors ~~beginning in 2007~~, MGM agreed to submit those bids to Sonopress, and Sonopress agreed (within certain limitations) to lower its prices under the Agreement to match those bids. The Agreement did not provide that MGM could abrogate its 120 million DVD unit "Guaranteed Quantity" commitment to take advantage of bids from Sonopress's competitors.

12. The Agreement assured that arvato distribution would receive the full 9 Million Euro DSA cancellation fee by providing that MGM would have to pay Sonopress 0.09 Euro for each DVD unit by which MGM fell short of ordering the Guaranteed Quantity. The only other provisions of the Agreement either expressly providing for or limiting damages are: paragraph 15(b), which provides that MGM shall indemnify Sonopress against all damages, losses and expenses, including legal fees, arising from MGM's breach of the Agreement; and paragraph 15(d) of the Agreement, which states, "in the absence of fraud and/or any other intentional or

5

willful misconduct by the other party, the other party's maximum liability for damages arising out of this Agreement for any Contract Year shall not exceed € 500,000."

19.  <u>MGM prepared the initial draft of the Agreement. Most of the provisions that are at issue in this litigation, including those pertaining to the "Guaranteed Quantity", the "Shortfall" and "Indemnification", are substantially or entirely identical to the initial MGM draft. The Agreement does not modify in any manner the canon of construction that provides that in the event a contract provision is ambiguous, it should be construed against the interests of the draftsman.</u>

20.  <u>On or about the date that MGM and Sonopress entered into the Agreement, MGM and arvato executed a First Amendment to the DSA (the "Amendment"). Paragraph 2 (which was drafted by MGM's counsel) provided:</u>

> <u>Condition Precedent. As a condition precedent to the early termination of the ... [DSA], MGM and Sonopress GmbH shall have entered into a nonexclusive worldwide replication agreement with a **volume commitment** of no less than **120 million** discs over a term of no more than 5 years starting January 1, 2005. (Emphasis added.)</u>

21.  <u>The purpose of the Amendment was to insure that arvato distribution received the agreed upon compensation of 9 million Euro for the premature termination of the DSA. The 9 million Euro payment was not intended to compensate Sonopress for its damages if MGM reneged on its commitment to order a minimum of 120,000,000 DVD units. Consequently, MGM's claim (which was asserted for the first time in this law suit) that it was granted the "option" to fulfill its contractual obligation to Sonopress either by ordering 120,000,000 DVD units or making a payment of 9 million Euros is without a basis either in the provisions of the Agreement, the Amendment to the DSA, or the parties' negotiations.</u>

A.  <u>MGM's ~~Failure to Perform Under~~Breach of the Agreement</u>

6

### The Cinram Agreement

22. On January 17, 2007, the parent company of Cinram International Inc. ("Cinram"), a major competitor of Sonopress, issued a press release announcing a multi-year European replication agreement with MGM. According to the release, Cinram was to "become the **exclusive** manufacturer of DVDs for MGM in the major Western European countries under a new agreement, effective in the first quarter of 2007." (Emphasis added.) In MGM's Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint in this action (the "MGM Brief"), MGM identifies Cinram's exclusive territory more broadly as "Western Europe".

23. MGM's grant of an exclusive to Cinram is a material breach of the Agreement, because approximately 96% of all the replication orders that MGM placed with Sonopress for DVDs in 2005 and 2006 were for Western Europe. Moreover, since Cinram announced that its "exclusive" for Western Europe is for a "multi-year" term, MGM has thus excluded Sonopress from its most important market for much (if not all) of the remaining term of the Agreement.

24. MGM clandestinely negotiated its contract with Cinram without notice to Sonopress. Sonopress only learned that MGM was frustrating the purpose and violating the terms of the Agreement when it received its competitor's press release.

25. Shortly thereafter, on January 26, 2007, MGM instructed Sonopress via email to allow Cinram "access to all the materials needed to fulfill replication and distribution of the MGM titles in Europe." MGM provided Sonopress with no additional information regarding the fate of the Agreement.

26. In response to Sonopress's prompt and repeated inquiries regarding whether MGM intended to comply with the terms of the Agreement, MGM sent a February 7, 2007 letter

7

requesting Sonopress's "assistance in facilitating a smooth transition of MGM's DVD replication in Europe to Cinram." The letter also stated that "MGM is committed to fulfilling its obligations under the Agreement and we look forward to continuing our partnership with you into the future." MGM further represented on February 7, 2007, that "we are still working on the Forecasted Volume for the next 12 months and we will provide it to you as soon as possible."

27.    ~~23.~~ Sonopress continued to ask MGM how it intended to fulfill its obligations under the Agreement and repeated its requests for MGM's required and overdue semi-annual forecast for the following twelve months. In a meeting on or about February 13, 2007, MGM represented to Sonopress that it was still investigating ways to place orders with Sonopress.

28.    ~~24.~~ Despite MGM's repeated assurances that it wanted to continue to work with Sonopress, MGM simultaneously continued its requests to Sonopress to transfer all of the MGM DVD masters and associated assets in Sonopress's archives to Cinram. In addition, MGM did not send Sonopress masters to any new releases other than "Texas Chainsaw Massacre Two".

29.    ~~25.~~ Finally, after nearly two months of equivocation, MGM admitted in a March 16, 2007 email that "at this point in time, the forecast capacity needs for this year do not include **any** unit capacity for Sonopress." (Emphasis added.)

30.    ~~26.~~ Thereafter, for approximately a six-week period, while MGM and Sonopress arranged for an orderly transition, including the physical transfer to Cinram of the thousands of MGM DVD masters and associated assets in Sonopress's archives, MGM placed limited orders with Sonopress for replication of titles from MGM's catalogs of previous releases, but did not request that Sonopress replicate any of MGM's new release titles. As of April 27, 2007, MGM ceased all replication orders from Sonopress.

31.   ~~27.~~ MGM has to date not come close to fulfilling its Guaranteed Quantity obligations under the Agreement.  Now that MGM has directed that Sonopress turn over to Cinram all MGM DVD masters and associated assets – making it impossible for Sonopress to replicate any MGM DVDs - and has admitted that it does not intend to order any DVD units from Sonopress over the remainder of this year, it is clear that MGM has no intention of ~~fulfilling the Agreement with Sonopress.~~ <u>ordering 120,000,000 DVD units from Sonopress.  Indeed, in the MGM Brief, MGM has all but admitted it has no intention of purchasing the required number of DVDs, since it has now falsely contended that it can meet its contractual obligations by exercising an "option" to pay 0.09 Euro for each DVD unit MGM fails to order.</u>

<u>MGM's newly disclosed breach of representation</u>

<u>32.   In footnote 5 of the MGM Brief, MGM disclosed, for the first time, that "MGM had **exclusive** replication agreements in several territories at the time the parties entered into the Sonopress Agreement, including for Western Europe." (Emphasis added.)  Contrary to the position that MGM has asserted in the MGM Brief, an "exclusive" and a "non-exclusive" can not simultaneously validly coexist in the same territory, for the same product or service.  Since MGM represented to Sonopress, in the final paragraph of Section 20 of the Agreement, that MGM "(b) … has the full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms and conditions hereof, and (c) the consent of no other person or entity is necessary in order for it to enter into this Agreement and/or perform the obligations required pursuant to this Agreement", MGM made a false representation and thereby materially breached the Agreement.</u>

33. At the time that MGM and Sonopress entered into the Replication Agreement, MGM representatives never informed Sonopress that MGM was a party to exclusive replication agreements.

34. ~~28.~~ MGM has thus utterly frustrated the purpose of the Agreement and acted in breach of its implied covenant of good faith and fair dealing by granting Cinram an "exclusive" for ~~the major countries of~~ Western Europe in blatant disregard of Sonopress's worldwide territorial grant, by requiring Sonopress to transfer the MGM masters and associated assets to Cinram, ~~and~~ by not ordering a quantity of DVD units consistent with the Guaranteed Quantity, and by falsely representing, at the time it entered into the Agreement, that entering into a worldwide non-exclusive replication agreement with Sonopress would not breach any obligations MGM had to third parties or require their consent. MGM has thereby destroyed Sonopress's ability to obtain the benefits it reasonably expected to receive under the Agreement.

## COUNT I
### Breach of Contract

35. ~~29.~~ Sonopress hereby repeats and incorporates the allegations contained in paragraphs 1-~~28.~~34.

36. ~~30.~~ MGM entered into a valid Agreement with Sonopress to replicate 120 million DVD units.

37. ~~31.~~ Sonopress has at all times performed all of its obligations under the Agreement and continues to do so.

38. ~~32.~~ Between January and April 2007, Defendant intentionally and willfully breached the Agreement, including its implied covenant of good faith, by: (a) entering into an exclusive agreement with Cinram for ~~the major countries of~~ Western Europe, ~~a key territory,~~ the territory to which Sonopress shipped approximately 96% of its DVD replication orders from

MGM in 2005 and 2006, thereby decimating Plaintiff's worldwide territory; (b) removing thousands of titles of MGM DVD masters and associated assets from Plaintiffs' possession, stripping Plaintiff of the chance to ~~duplicate~~replicate those DVD units; and (c) informing Plaintiff that MGM did not expect to purchase any additional DVD units. MGM also breached the Agreement by misrepresenting, at the time the parties entered into the Agreement, that MGM was free to grant to Sonopress the rights provided in the Agreement, when MGM in fact knew (but did not disclose) that it had granted others exclusive replication rights in key portions of Sonopress's territory.

39. ~~33.~~ As a direct and proximate result of these breaches, Sonopress has sustained damages and will incur further damages in an amount to be proven at trial, but which Sonopress currently anticipates to be in the tens of millions of dollars.

**COUNT II**
**Anticipatory Breach of Contract**

40. ~~34.~~ Sonopress hereby repeats and incorporates the allegations contained in paragraphs 1-~~28~~34 and ~~30-31,~~36-37.

41. ~~35.~~ In the event that the Court concludes that the Agreement has not yet been breached despite the foregoing facts, at the very least MGM has intentionally and willfully anticipatorily repudiated the Agreement by: (a) giving Sonopress a definite and final communication of MGM's intention not to ~~replicate~~place orders for the replication of 120 million DVD units under the terms of the Agreement; (b) entering into an exclusive agreement with Cinram for ~~the major countries of~~ Western Europe, ~~a key territory,~~the territory to which Sonopress shipped approximately 96% of its DVD replication orders from MGM in 2005 and 2006, thereby decimating Plaintiff's worldwide territory; (c) removing thousands of titles of MGM DVD masters and associated assets from Plaintiff's possession, ~~thereby~~ stripping Plaintiff

of the chance to ~~duplicate those DVDs~~replicate these DVD units; and (d) informing Plaintiff that MGM did not expect to purchase any additional DVD units. <u>MGM also breached the Agreement by misrepresenting, at the time the parties entered into the Agreement, that MGM was free to grant to Sonopress the rights provided in the Agreement, when MGM in fact knew (but did not disclose) that it had granted others exclusive replication rights in key portions of Sonopress's territory</u>.

<u>42.</u>   ~~36.~~ As a direct and proximate result of these breaches, Sonopress has sustained damages and will incur further damages in an amount to be proven at trial, currently anticipated to be in the tens of millions of dollars.

## COUNT III
## Indemnification

<u>43.</u>   ~~37.~~ Sonopress hereby repeats and incorporates the allegations contained in paragraphs 1-~~28~~<u>34</u> and ~~30-31.~~<u>36-37.</u>

<u>44.</u>   ~~38.~~ Paragraph 15(b) of the Agreement provides that "MGM shall indemnify, defend and save harmless Sonopress from and against any and all costs, … harm, damages, … losses and expenses (including, without limitation, all reasonable legal fees and disbursements) of any and every nature and kind whatsoever … actually incurred, sustained or suffered by Sonopress or by any of its Affiliates … arising from, or otherwise attributable to (a) MGM's (or any of its affiliates') breach of, alleged breach of, or non-compliance with any of the provisions of this Agreement …"

<u>45.</u>   ~~39.~~ Between January and April 2007, Defendant intentionally and willfully breached the Agreement ~~and,~~ <u>including</u> its implied covenant of good faith<u>,</u> by: (a) entering into an exclusive agreement with Cinram for ~~the major countries of~~ Western Europe, ~~a key~~

12

territory,the territory to which Sonopress shipped approximately 96% of its DVD replication orders from MGM in 2005 and 2006, thereby decimating Plaintiff's worldwide territory; (b) removing thousands of titles of MGM DVD masters and associated assets from Plaintiffs' possession, stripping Plaintiff of the chance to duplicate those DVD units; and (c) informing Plaintiff that MGM did not expect to purchase any additional DVD units. MGM also breached the Agreement by misrepresenting, at the time the parties entered into the Agreement, that MGM was free to grant to Sonopress the rights provided in the Agreement, when MGM in fact knew (but did not disclose) that it had granted others exclusive replication rights, in key portions of Sonopress's territory.

46.    40. As a direct and proximate result of these breaches, Sonopress has sustained damages and will incur further damages in an amount to be proven at trial, but which Sonopress currently anticipates to be in the tens of millions of dollars.

## COUNT IV
## Declaratory Judgment

47.    41. Sonopress hereby repeats and incorporates the allegations contained in paragraphs 1-28, 30-31, 35-3634, 36-37, 41-42 and 38-40.44-45.

48.    42. As alleged herein, a justiciable controversy exists as to the rights and obligations of Sonopress and MGM pursuant to the Agreement.

49.    43. Specifically, although the Agreement provides for athere is a present substantial disagreement between the parties as to whether, as Sonopress contends, MGM has an obligation to purchase from Sonopress the "Guaranteed Quantity" of 120 million DVD units and MGM "committed" to purchasing this quantity, MGM now appears to be asserting that it is not required to order 120 million DVD units, whereas Sonopress contends that MGM has a

13

~~contractual duty to order the "Guaranteed Quantity" and will be liable for Sonopress's damages, losses and expenses, including lost profits, unrecovered expenses and legal fees,~~<u>or whether, as MGM contends, MGM has the "option" not to purchase any DVD units between now and December 31, 2010 and instead to pay Sonopress on that date 0.09 Euro for any "Shortfall" in its orders. There also is a present substantial disagreement between the parties as to whether there is a "cap" of 0.09 Euro per DVD disc on what damages Sonopress can recover</u> if MGM fails to honor its obligations under the Agreement. <u>Finally, there is a present substantial disagreement between the parties as to whether the Agreement's indemnification provision is limited to third-party claims or whether it also applies to direct claims by Sonopress against MGM for breach of contract.</u>

<u>50.</u>   <u>Sonopress can not determine how to allocate its replication capacity among its customers, including MGM, and whether it needs to make capital expenditures to meet customer demand, if it will not learn until December 31, 2010 (a) whether it will receive any replication orders from MGM between now and the end of 2010 and, if so, (b) when and (c) for how many DVD units.</u>

<u>51.</u>   ~~44.~~ Based on all the foregoing, Sonopress is entitled to a judicial declaration that:

    (i)   the Agreement mandates purchase of 120 million DVD units;

    (ii)   MGM has intentionally and willfully (a) breached the Agreement, or (b) anticipatorily repudiated the Agreement; and

    (iii)   the damages available for MGM's intentional and willful breach or anticipatory repudiation of the Agreement include but are not limited to:

        (a)   the 0.09 Euro per DVD unit of compensation for the early DSA termination, described in the contract as the "Shortfall Amount"; and

14

   (b) additional compensation, in an amount to be determined at trial.

(iv) it~~Sonopress~~ is entitled to indemnification from MGM for any and all damages, losses, costs and expenses (including reasonable legal fees and disbursements) that Sonopress has occurred or may hereafter incur as a result of MGM's breach of or non-compliance with any of the provisions of the Agreement.

### Prayer for Relief

WHEREFORE, Plaintiff Sonopress demands that judgment be entered against Defendant MGM as follows:

1. On Count I, damages in an amount to be determined at trial;

2. On Count II, damages in an amount to be determined at trial;

3. On Count III, damages in an amount to be determined at trial;

4. On Count IV, a judgment declaring that:

 (i) the Agreement mandates purchase of 120 million DVD units;

 (ii) MGM has intentionally and willfully (a) breached the Agreement, or (b) anticipatorily repudiated the Agreement;

 (iii) Sonopress is entitled to indemnification from MGM; and

 (iv) the damages available for MGM's intentional and willful breach or anticipatory repudiation of the Agreement or under the Agreement's indemnification provisions include but are not limited to:

  (a) the 0.09 Euro per DVD unit of compensation for the early DSA termination, described in the contract as the "Shortfall Amount"; and

   (b) compensation for all Sonopress's losses, damages and costs, in an amount to be determined at trial;

5. Costs and expenses, including reasonable attorneys' fees, as permitted by law; and

6. Such other and further relief as the Court may deem proper.


Dated: ~~May 11,~~ July___, 2007


         By_____
          Alan Kanzer (AK 5839)
          Amber C. Wessels (AW 2322)
          ALSTON & BIRD LLP
          90 Park Avenue
          New York, New York 10016
          (212) 210-9400
          *Attorneys for ~~Plaintiffs~~Plaintiff*

30450263