Alan Kanzer (AK 5839)
Amber C. Wessels (AW 2322)
ALSTON & BIRD LLP
90 Park Avenue
New York, New York  10016
(212) 210-9400

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SONOPRESS GmbH,** | |
| **Plaintiff,** | **Case No. 07 CIV 3752** |
| **v.** | |
| **METRO-GOLDWYN-MAYER HOME ENTERTAINMENT LLC,** | |
| **Defendant.** | |

**MEMORANDUM OF LAW IN OPPOSITION TO MGM'S MOTION TO DISMISS AND IN SUPPORT OF SONOPRESS'S CONDITIONAL MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTS................................................................................................2

I.      The Dissolution of MGM's Contract with arvato distribution and MGM's Proposed Solution..................................................................2

II.     The Replication Agreement and MGM's Breach............................................3

III.    New Facts Learned Since the Complaint Was Filed .....................................5

ARGUMENT..........................................................................................................7

I.      The Complaint States a Claim for Breach of Contract...................................8

    A.    Sonopress's Worldwide Non-exclusive Was Violated by MGM's Grant to Cinram of an Exclusive for Western Europe, Sonopress's Major Market...........................................................8

    B.    MGM, By Its Own Admission, Has Breached the Contract .........................9

    C.    The Replication Agreement Requires a Guaranteed Quantity of 120 Million DVD units.......................................................10

    D.    If the Replication Agreement is Ambiguous, Its Meaning Cannot Be Resolved on a Motion to Dismiss ...........................................12

II.     Plaintiff Has Stated a Claim for Anticipatory Breach .................................13

III.    Plaintiff Has Stated a Claim for Indemnification .........................................16

IV.    Plaintiff Has Stated a Claim for Declaratory Judgment ...............................17

V.     If the Court Grants MGM's Motion to Dismiss, Sonopress Should Be Allowed to Submit a First Amended Complaint.....................................19

CONCLUSION ......................................................................................................21

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*,
    404 F.3d 566 (2d Cir. 2005) ..................................................................... 14

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004) ....................................................................... 7

*Board of Regents of the University of Nebraska v. BASF*,
    4:04cv3356, 2006 WL 2583253 (D. Neb. Sept. 6, 2006) ........................... 9

*Bradford v. New York Times Co.*,
    501 F.2d 51 (2d Cir. 1974) ....................................................................... 11

*Broadview Chem. Corp. v. Loctite Corp.*,
    417 F.2d 998 (2d Cir. 1969) ..................................................................... 18

*Burger King Corp. v. Weaver*,
    169 F. 3d 1310 (11th Cir. 1999) ................................................................. 9

*Clalit Health Services v. Israel Humanitarian Foundation*,
    No. 02-cv-6552, 2003 WL 22251329 (S.D.N.Y. Sept. 30, 2003) ............... 19

*Consarc Corp. v. Marine Midland Bank, N.A.*,
    996 F.2d 568 (2d Cir. 1993) ..................................................................... 13

*Continental Cas. Co. v. Coastal Sav. Bank*,
    977 F.2d 734 (2d Cir. 1992) ..................................................................... 18

*Dresser-Rand Co. v. Virtual Automation Inc.*,
    361 F.3d 831 (5th Cir. 2001) ....................................................................... 8

*Farrell Lines Inc. v. Columbus Cello-Poly Corp.*,
    32 F. Supp. 2d 118 (S.D.N.Y. 1997) ......................................................... 19

*Fen Hin Chon Enterprises, Ltd. v. Porelon, Inc.*,
    874 F.2d 1107 (6th Cir. 1989) ..................................................................... 8

*Golden v. Zwickler*,
    394 U.S. 103 (1969) ................................................................................. 18

*Graphic Technology, Inc. v. Pitney Bowes Inc.*,
968 F. Supp. 602 (D. Kan. 1997)...................................................................8

*Hummingbird USA, Inc., v. Texas Guaranteed Student Loan Corp.*,
No. 06-cv-7672, 2007 WL 163111 (S.D.N.Y. Jan. 22, 2007)....................................19

*Information Superhighway, Inc. v. Talk America, Inc.*,
274 F. Supp. 2d 466 (S.D.N.Y. 2003) ....................................................13

*Kaster v. Modification Systems, Inc.*,
731 F.2d 1014 (2d Cir. 1984) ................................................................19

*Kidder Peabody & Co., Inc. v. Maxus Energy Corp.*,
925 F.2d 556 (2d Cir. 1991) ................................................................18

*Laurus Master Fund, Ltd. v. Versacom Int'l, Inc.*,
No. 02-cv-5340, 2003 WL 21219791 (S.D.N.Y. May 21, 2003)...............................12

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
507 U.S. 163 (1993) ........................................................................7

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) ................................................................12

*Lucente v. International Business Machines Corp.*,
310 F.3d 243 (2d Cir. 2002) ................................................................14

*Milanese v. Rust-Oleum Corp.*,
244 F.3d 104 (2d Cir. 2001) ................................................................19

*Payne v. McDonald's Corp.*,
957 F. Supp. 749 (D. Md. 1997)..............................................................9

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ........................................................................7

*Seiden Associates, Inc. v. ANC Holdings, Inc.*,
959 F.2d 425 (2d Cir. 1992) ................................................................13

*Swierkiewicz v. Sorema*,
534 U.S. 506 (2002) ........................................................................7

*This is Me, Inc. v. Taylor*,
157 F.3d 139 (2d Cir. 1998) ................................................................11

*United Liquors, Inc. v. Carillon Importers*, Ltd.,
    893 F.2d 1 (1st Cir. 1989)...................................................................................8

## STATE CASES

*Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*,
    747 N.Y.S.2d 468 (App. Div. 1st Dept. 2002) ...........................................14

*Hasbrouck v. Van Winkle*,
    27 N.Y.S.2d 72 (App. Div. 3d Dept. 1941) ................................................11

*Hornell Brewing Co., Inc. v. Spry*,
    664 N.Y.S.2d 698, 1997 N.Y. Slip Op. 95763 (Sup. Ct. 1997) ...................16

*Integrated Micro Systems, Inc. v. NEC Home Electronics (USA), Inc.*,
    174 Ga. App. 197, 329 S.E. 2d 554 (Ga. App. 1985).....................................9

*McDermott v. City of New York*,
    50 N.Y.2d 211 (1980)..................................................................................16

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
    92 N.Y.2d 458 (1998)..............................................................................14, 15

*Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assoc.*,
    816 N.Y.S.2d 831, 2006 N.Y. Slip Op. 26072 (N.Y. Sup. Ct. 2006)...........11

*Silverman v. Carvel Corp.*,
    778 N.Y.S.2d 515, 2004 N.Y. Slip Op. 05230 (App. Div. 2nd Dept. 2004)................9

*Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*,
    146 Wis.2d 568, 431 N.W.2d 721 (Ct. App. Wisc. 1988)..............................9

*Zuckerwise v. Sorceron Inc.*,
    735 N.Y.S.2d 100, 2001 N.Y. Slip Op. 10198 (App. Div. 1st Dept. 2001) ...............13

## FEDERAL STATUTES

28 U.S.C. §2201 (West 2006)..................................................................................17

Fed. R. Civ. P. 12(b)(6) ..........................................................................................19

## STATE STATUTES

N.Y.-U.C.C. §2-609(2) ................................................................................................. 15

N.Y.-U.C.C. § 2-609(4) ................................................................................................ 15

## MISCELLANEOUS

Peter A. Hunt, *Structuring Mergers & Acquisitions* (3rd Ed. 2007) ¶27.08 at 651 ...................... 16

## PRELIMINARY STATEMENT

The parties are before the Court in this case because Metro-Goldwyn-Mayer Home Entertainment LLC ("MGM") has failed to fulfill its obligations in two successive contracts with Bertelsmann entities.   The first time MGM walked away from its obligations under a Distribution Services Agreement ("DSA") with arvato distribution GmbH ("arvato distribution").   MGM then offered as compensation a new Replication Agreement with Sonopress GmbH ("Sonopress").   MGM is now attempting to disregard its obligations under that Replication Agreement, but this time it is not offering any compensation for its breach.   Instead, MGM contends that the only consequence for not honoring its duties to *Sonopress* is that MGM must pay the monies still due to *arvato distribution* for MGM's previous early termination of the DSA.   In essence, MGM is arguing that the parties, when they entered into the Replication Agreement, intended that MGM would be able to walk away from yet another contract with no additional repercussions, and that Sonopress would receive no compensation for MGM's breach.

As we show below, Sonopress has duly stated claims for breach of contract, anticipatory repudiation, indemnification and for a declaratory judgment.   Consequently, MGM's Rule 12(b)(6) motion to dismiss should be denied.   However, in the event this Court concludes that Sonopress's complaint is deficient in some respect, then Sonopress respectfully requests that its conditional cross-motion for leave to amend be granted.

## RELEVANT FACTS

I.  **The Dissolution of MGM's Contract with
    arvato distribution and MGM's Proposed Solution**

In August 2004, MGM entered into a twenty-eight month DSA with Sonopress's affiliate, arvato distribution. Compl. ¶ 8.  Only a few weeks after the parties signed this DSA, however, it was publicly announced that MGM's parent company, Metro-Goldwyn-Mayer, would be acquired by a consortium of investors, including Sony Corporation (collectively "Sony"). Compl. ¶ 9.  As a result of this acquisition, MGM and Sony determined that MGM's distribution should be handled by Sony, notwithstanding MGM's contractual obligations to arvato distribution. Compl. ¶¶ 9-10. Accordingly, less than nine months into the twenty-eight month term of the DSA, MGM sought to escape from that agreement. Compl. ¶ 10.

MGM accordingly informed arvato distribution that it was terminating the DSA and entered into negotiations with arvato distribution and Sonopress to compensate the Bertelsmann Group for the early termination. Compl. ¶ 10.  Although arvato distribution had estimated its losses for MGM's breach of contract at 14 million Euros[1], MGM countered with an estimate of 7-9 million Euros in compensation. Compl. ¶ 10.  MGM told arvato distribution and Sonopress that it had considered but rejected the options of continuing to do business with, or paying immediate compensation to, arvato distribution. Compl. ¶ 10.  Instead, it offered to enter into a contract with Sonopress for replication services, and to compensate for its early termination of the DSA, a few cents at a time, over a five-year period. Compl. ¶¶ 11-13.  Presented with this fait accompli from MGM,

---

[1] One Euro is currently valued at 1.38 U.S. Dollars.

arvato distribution faced the undesirable option of either accepting MGM's offer or taking MGM to court.

To make its offer palatable to arvato distribution and Sonopress, MGM told them that it was **committing** to order 120 million DVD units from Sonopress over this period. Compl. ¶ 11. In the May 3, 2005 memorandum that it sent to arvato distribution and Sonopress, MGM represented that it would "replace the balance of the commitment made by MGM to arvato [distribution] for distribution services by a **commitment** on manufacturing services made by NewCo/MGM to Sonopress." (Emphasis added.) Compl. ¶ 11. MGM had previously committed to order 10 million units in each of 2005 and 2006. Compl. ¶ 11. Under its proposal, MGM now committed to order an additional 100 million units from Sonopress between 2007 and 2009, and committed to pay a surcharge of 0.09 Euro per unit for each of these units. Compl. ¶ 11-13. MGM would thereby be able to pay arvato distribution only 9 million Euros in compensation, and would be able to stretch out its payments over five years without paying any interest charges. Sonopress was to pass this surcharge directly through to arvato distribution as compensation and would not benefit from the surcharge. Compl. ¶ 13. Sonopress, however, would benefit from obtaining an additional 100 million units of orders from MGM. Each unit would cost somewhere between fifty Euro cents and six Euros. Compl. ¶ 16.

## II.    The Replication Agreement and MGM's Breach

The terms of the Replication Agreement reflected the parties' negotiations and understandings. MGM's commitment to order a minimum number of 120 million DVD units was memorialized in Section 1's definition titled "Guaranteed Quantity". Compl. ¶ 14. Because both MGM and Sonopress operate worldwide, Sonopress was granted

worldwide replication rights on a non-exclusive basis. Compl. ¶ 14. The parties agreed that, even if MGM received a bona fide lower bid from Sonopress's competitors, MGM would still order 120 million DVD units from Sonopress, and codified this agreement in Section 5 of the Replication Agreement. Compl. ¶ 17. They also protected arvato distribution's 0.09 Euro surcharge by ensuring that if MGM breached the contract, the surcharge would be an element of damages, and codified this agreement in Section 2 of the Replication Agreement. Compl. ¶18. Finally, they agreed on a maximum liability for damages arising out of breach of the Replication Agreement, further agreed that this limit would not apply to a party's fraudulent or intentional misconduct, and codified this limitation in paragraph 15(d) of the Replication Agreement. Compl. ¶18.

Sonopress first learned MGM intended to breach the Replication Agreement when it read a press release of Cinram, a competitor. Compl. ¶ 20. Cinram trumpeted that it had signed a *multi-year* contract with MGM to become MGM's exclusive DVD replicator for MGM in Western Europe under a new agreement, effective in the first quarter of 2007. Compl. ¶ 19. Sonopress, concerned that MGM had just eviscerated its Replication Agreement, promptly asked MGM whether it intended to comply with the terms of the Replication Agreement. Compl. ¶ 22. MGM's only answer over the following few weeks was to tell Sonopress to box up and ship to Cinram all of MGM's masters and any additional materials necessary to replicate MGM's DVDs. Compl. ¶ 21. Although MGM told Sonopress that it was investigating ways to keep placing orders with Sonopress, it did not attempt to explain how it could conceivably place orders with Sonopress once Sonopress had sent all of the MGM material to Cinram. Compl. ¶ 22-24.

Finally, after two months of equivocation, MGM admitted that it did not intend to place any more orders with Sonopress in 2007. Compl. ¶ 25. Moreover, although MGM continued to mouth platitudes about being "committed to fulfilling its obligations," it pointedly avoided committing to place any orders with Sonopress at any point over the remaining term of the contract. Concerned that MGM's empty assurances disguised a distorted view of MGM's obligations under the Replication Agreement, Sonopress petitioned this Court for relief. Sonopress's fear has now been realized: MGM is not only in breach of the Replication Agreement, but is arguing that the only consequence for its breach of the Replication Agreement is that it must compensate arvato distribution – in 2010 – for its termination of the DSA, and that Sonopress is entitled to no remedy at all for MGM's breach.

## III. <u>New Facts Learned Since the Complaint Was Filed</u>

In the event that this Court grants Defendant's motion to dismiss in whole or in part, Sonopress has moved for leave to file a First Amended Complaint that will contain the following additional relevant facts supporting Plaintiff's claims:

The Replication Agreement, including the ambiguous provisions of the Replication Agreement that are at issue in this litigation, was drafted in whole or in substantial part by MGM. Am. Compl. ¶ 19. The Replication Agreement furthermore does not purport to abrogate the canon of construction that any ambiguities in a contract will be construed against the interests of the draftsman. Am. Compl. ¶ 19. While MGM and Sonopress were negotiating the Replication Agreement, MGM simultaneously negotiated with arvato distribution an Amendment terminating the DSA. Am. Compl. ¶ 20. This Amendment was also drafted in whole or in substantial part by MGM, and it contained a condition precedent – that MGM and Sonopress would enter into "a non-

exclusive worldwide replication agreement with a volume commitment of no less than 120 million discs." Am. Compl. ¶ 20.   The purpose of this Amendment was to insure that arvato distribution received the agreed upon compensation of 9 million Euro for the premature termination of the DSA.   That 9 million Euro was not intended to compensate Sonopress for its damages if MGM reneged on its commitment to order a minimum of 120,000,000 DVD units.   Consequently, MGM's claim (which was asserted for the first time in this lawsuit) that it was granted the "option" to fulfill its contractual obligation to Sonopress either by ordering 120,000,000 DVD units or making a payment of 9 million Euro is without a basis either in the Replication Agreement, the Amendment, or the parties' negotiations. Am. Compl. ¶¶ 21 and 31.

Sonopress's proposed First Amended Complaint will also allege that at the time that MGM entered into the Replication Agreement, it was a party to exclusive replication agreements in multiple territories, including Western Europe. Am. Compl. ¶ 32.   These exclusive replication agreements conflicted with Sonopress's worldwide territory.   Am. Compl. ¶ 32.   However, during the negotiation of the Replication Agreement, MGM representatives never informed Sonopress that MGM was a party to exclusive replication agreements. Am. Compl. ¶ 33.   MGM also falsely represented, in Section 20 of the Replication Agreement, that by entering into the Replication Agreement, MGM would not breach any obligations it had to third parties or require their consent to grant Sonopress a worldwide non-exclusive replication agreement. Am. Compl. ¶ 32.

MGM's exclusive multi-year replication agreement with Cinram covers the entire territory of Western Europe. Am. Compl. ¶ 22.   During the time that MGM placed orders with Sonopress in 2005 and 2006 under the Replication Agreement, 96% of those

orders were sent to Western Europe. Am. Compl. ¶ 23. MGM's contract with Cinram therefore removed 96% of Sonopress's historic order base. Am. Compl. ¶ 23.

Finally, Sonopress can not determine how to allocate its replication capacity among its customers, including MGM, and whether it needs to make capital expenditures to meet customer demand, if it will not learn until December 31, 2010 (a) whether it will receive any replication orders from MGM between now and the end of 2010 and, if so, (b) when and (c) for how many DVD units.


## ARGUMENT

At the Motion to Dismiss stage, a district court must treat all facts alleged in the complaint as true, and must draw all reasonable inferences in favor of plaintiff. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004). Under Federal Rule of Civil Procedure 8(a), the complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A district court should only dismiss a complaint for failure to state a claim "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" *Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002). Sonopress has adequately pled sufficient facts to state claims for breach of contract, anticipatory breach of contract, indemnification, and declaratory judgment.

I.      **The Complaint States a Claim for Breach of Contract**

     A.      Sonopress's Worldwide Non-exclusive Was Violated by MGM's Grant to Cinram of an Exclusive for Western Europe, Sonopress's Major Market

Contrary to MGM's unsupported and unsupportable contention, Sonopress is not trying to convert its worldwide non-exclusive contract into an exclusive contract. Sonopress merely seeks redress from MGM's blatant and brazen attempts to deprive Sonopress of its undeniable and significant right to replicate 120,000,000 DVD units under the Replication Agreement.

Sonopress's position, clearly stated, is that MGM's grant to Cinram of exclusive replication rights for Western Europe, Sonopress's major market, is inconsistent with, and a material breach of, MGM's preexisting grant to Sonopress of worldwide non-exclusive replication rights. *See, e.g., Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 846 (5th Cir. 2001) (finding breach of a non-exclusive contract as a matter of law because "[s]imply stated, Apix's non-exclusive grant to Dresser Rand and the contemporaneously-granted exclusive right to Virtual Automation within the same market do not appear to be reconcilable."); *Graphic Technology, Inc. v. Pitney Bowes Inc.*, 968 F. Supp. 602, 606 (D. Kan. 1997) (finding that a non-exclusive worldwide license was "in conflict with" an exclusive license for the United Kingdom, Belgium, and the Netherlands); *see also United Liquors, Inc. v. Carillon Importers, Ltd.,* 893 F.2d 1, 2 (1st Cir. 1989) (noting that defendant terminated plaintiff's exclusivity by adding a distributor); *Fen Hin Chon Enterprises, Ltd. v. Porelon, Inc.*, 874 F.2d 1107, 1109 (6th Cir. 1989) (determining damages applicable where defendant had, notwithstanding an exclusive agreement with plaintiff, secretly done business in the territory with plaintiff's competitor); *Board of Regents of the University of Nebraska v. BASF*, 4:04cv3356, 2006

WL 2583253 (D. Neb. Sept. 6, 2006) (allowing intervention of a third party claiming a non-exclusive worldwide license, in order to allow that party to defend its interest, where plaintiff asserted it possessed an exclusive worldwide license and defendant asserted it possessed a non-exclusive license for the United States and Canada).

MGM relies almost exclusively on a small number of inapposite franchise cases from other states, disregarding a critical distinction between those cases and this action. The defendants in those cases are accused of establishing competing *non-exclusive* franchises.[2] If MGM had merely signed a non-exclusive contract with Cinram, and had maintained the guaranteed volume of orders to Sonopress, the parties would not be in court today. The sole New York case cited by MGM, *Silverman v. Carvel Corp.*, 778 N.Y.S.2d 515, 2004 N.Y. Slip Op. 05230 (App. Div. 2nd Dept. 2004) is distinguishable on its face, because the plaintiff failed to plead the existence of *any* competing store selling Carvel products within plaintiff's exclusive territory.

B.    MGM, By Its Own Admission, Has Breached the Contract

MGM has contended in footnote 5 of its Memorandum of Law in Support of MGM's Motion to Dismiss (the "MGM Brief") that "Sonopress was aware that MGM had exclusive replication agreements in several territories at the time the parties entered into the Sonopress Agreement, including for Western Europe." Putting to one side

---

[2] See, e.g., *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.* 146 Wis.2d 568, 431 N.W.2d 721 (Ct. App. Wisc. 1988) (rights of *non-exclusive* franchisee not violated by franchisor granting a *non-exclusive* franchise to another franchisee in the same territory); *Burger King Corp. v. Weaver*, 169 F. 3d 1310 (11th Cir. 1999) (same); *Payne v. McDonald's Corp.*, 957 F. Supp. 749 (D. Md. 1997) (same). See also *Integrated Micro Systems, Inc. v. NEC Home Electronics (USA), Inc.,* 174 Ga. App. 197, 329 S.E. 2d 554 (Ga. App. 1985) (supplier did not violate a distributor's *non-exclusive* dealership by appointing another *non-exclusive* dealer in the same territory).

MGM's improper attempt to introduce facts outside the scope of this Motion to Dismiss,[3]

if such exclusive replication agreements in fact existed at the time the Replication

Agreement was entered into, then MGM's representation in Section 20 of the Replication

Agreement that:

> (b) it has the full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms and conditions hereof, and (c) the consent of no other person or entity is necessary in order for it to enter into this Agreement and/or perform the obligations required pursuant to this Agreement

is necessarily false.  For the reasons discussed in Section "A" above, a party cannot

simultaneously enter into both an exclusive and a non-exclusive replication agreement for

the same products at the same time in overlapping territories.

> C.     The Replication Agreement Requires a Guaranteed Quantity of 120 Million DVD units

The Shortfall Amount is not, as MGM contends, a means of "alternative

performance", but is a remedy available to Sonopress if MGM breaches the Agreement.

The Agreement clearly states that it calls for a *guaranteed* quantity of 120 million DVD

units, and it embodies the parties' intent that MGM was committing to order 120 million

DVD units from Sonopress.   Moreover, if the Court grants Sonopress's conditional

motion for leave to amend its complaint, the first amended complaint will allege that, as

part and parcel of the negotiation of the Replication Agreement, MGM and arvato

distribution contemporaneously entered into a June 30, 2005 Amendment governing the

early termination of the DSA.  This Amendment, which was also primarily drafted by

---

[3] Although Defendant seeks to introduce this new "fact", it has not moved for summary judgment.  If this Court elects to convert the Motion to Dismiss to a Motion for Summary Judgment, Plaintiff would also seek to introduce additional evidence, including but not limited to the facts that (a) during the negotiation of the Replication Agreement, MGM representatives never informed Sonopress that MGM was a party to any exclusive replication agreements and (b) in paragraph 20 of the Replication Agreement, MGM represented that there were no contractual bars to its entering into the Replication Agreement.

MGM, contained a condition precedent: that MGM and Sonopress would enter into "a non-exclusive worldwide replication agreement with a *volume commitment* of no less than 120 million discs." (Emphasis added). Agreements entered into as part of the same transaction should be read together, (*This is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998)) and MGM's acceptance of this condition precedent further demonstrates that MGM committed to the 120 million unit volume.

MGM quotes *Bradford v. New York Times Co.*, 501 F.2d 51, 56 (2d Cir. 1974), but ignores its holding. Although *Bradford* noted in passing that "New York recognizes that *on occasion* a contract may truly provide" alternative performance, it went on to hold that "[w]e do not construe this contract to be of this category." 501 F.2d at 56 (emphasis added).[4] Instead, the court held that the provision at issue was a provision for liquidated damages, quoting Corbin on Contracts: "'if there is a promise to render one particular performance, with a provision for payment of a sum of money as a penalty or as liquidated damages for breach, without anything more, the contract is not an alternative contract.'" *Id.*

Under the Replication Agreement, MGM promised to purchase a Guaranteed Quantity of 120 million DVD units, and the Shortfall Amount is simply *one* of the damage remedies available if MGM breaches its promise to purchase the Guaranteed

---

[4] The *Bradford* court and plaintiff both cite to *Hasbrouck v. Van Winkle*, 27 N.Y.S.2d 72 (App. Div. 3d Dept. 1941), a highly distinguishable opinion regarding defendants' promise to build a "dwelling house" on farmland, citing an early 1800's case regarding promises to build homes on land conveyed. The only additional case cited by plaintiff, *Northwestern Mut. Life Ins. Co. v. Uniondale Realty Assoc.*, 816 N.Y.S.2d 831, 2006 N.Y. Slip Op. 26072 (N.Y. Sup. Ct. 2006), involves mortgage prepayment. Cases involving real property are frequently governed by different rules of law and interpretation from those involving the sale of goods or provision of services. Compare, for example, Article 2 of the New York Uniform Commercial Code, which governs sale of goods, and Article 2A of the UCC, which governs leases of personal property but not real property, with statutes pertaining solely to real property, such as McKinney's Real Property, Mc Kinney's Real Property Tax and the separate Statute of Frauds, General Obligations Law § 5-703, which pertains only to real property.

Quantity[5]. There is nothing in the text of Section 2 of the Replication Agreement to suggest that this provision was intended to be Sonopress's *sole remedy* for MGM's breach of contract. Because the contract contains no language mandating that the liquidated damages must be the sole remedy, other damages are available. *Laurus Master Fund, Ltd. v. Versacom Int'l, Inc.*, No. 02-cv-5340, 2003 WL 21219791 (S.D.N.Y. May 21, 2003) ("[i]n addition, Laurus is entitled to consequential damages").

Sonopress has stated a claim that MGM breached its promise to purchase the Guaranteed Quantity called for by the Replication Agreement; as the case proceeds, the parties will be able to advocate their positions regarding the measure of damages available for this breach.

D.    If the Replication Agreement is Ambiguous, Its Meaning
      Cannot Be Resolved on a Motion to Dismiss

The essential tool in properly interpreting a contract is determining the intent of the parties. "Unless the intent is unambiguous from the four corners of the documents, extrinsic evidence of the parties' intent should be received." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 896 (2d Cir. 1976) (citations omitted). In this litigation, Sonopress and MGM have each offered its competing account of the parties' intent in entering into the Replication Agreement and each cites to contract provisions reflecting its respective view of that intent, *e.g.*, the Replication Agreement's provisions regarding the definitions of Guaranteed Quantity, the Shortfall Amount, and paragraphs 2, 5(c) and 15(d).

---

[5] Indeed, as noted above, the Shortfall Amount was intended to compensate arvato distribution for the early termination of the DSA. From Sonopress's standpoint, this is a pass-through payment, and does not provide any compensation to it in the event that there is a breach of MGM's commitment to purchase 120,000,000 DVD units from Sonopress.

Sonopress alleges that these clauses, taken together, mean that: MGM committed to purchase 120 million Units from Sonopress; if MGM receives a competing offer, its only remedy is to use paragraph 5(c) to renegotiate Sonopress's unit price; and, in addition to all foreseeable damages arising from breach of this commitment, MGM must pay the Shortfall Amount. Complaint, ¶¶ 14, 17-18, 38. MGM interprets these clauses to support its position that MGM has an option to disregard its Guaranteed Quantity commitment, and the only consequence for failing to order the Guaranteed Quantity is that MGM must pay the Shortfall Amount. MGM Brief pp 3-5.

If this Court gives credence to MGM's response and determines that these provisions of the contract are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement", the contract is ambiguous. *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). The meaning of an ambiguous contract cannot be decided as a matter of law on a motion to dismiss. *Information Superhighway, Inc. v. Talk America, Inc.*, 274 F. Supp. 2d 466, 470 (SDNY 2003); *Zuckerwise v. Sorceron Inc.*, 735 N.Y.S.2d 100, 2001 N.Y. Slip Op. 10198 (App. Div. 1st Dept. 2001) (same). The court must use extrinsic evidence of the parties' intent to interpret the ambiguous portions of the contract, and this evidence must be considered by the finder of fact. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573-74 (2d Cir. 1993).

## II.    Plaintiff Has Stated a Claim for Anticipatory Breach

MGM misconstrues *Lucente v. International Business Machines Corp.*, 310 F.3d 243 (2d Cir. 2002) and ignores portions of *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458 (1998) in order to support its untenable claim that

anticipatory breach occurs "only" when a party unequivocally "declares" its intention to breach the contract. The court in *Lucente* stated simply that anticipatory repudiation occurs when . . . a party to a contract declares his intention not to fulfill a contractual duty" – citing *Norcon* and *Franconia Associates v. United States*, 536 U.S. 129 (2002) – and went on, without further elaboration of what might constitute a "declaration", to discuss the non-repudiating party's response to an anticipatory breach. At no point do any of the *Lucente*, *Franconia*, or *Norcon* decisions state that "only" a written or oral declaration constitutes repudiation. In fact, *Franconia* specifically states that "repudiation entails a statement or '*voluntary affirmative act*.'" 536 U.S. at 143. *Norcon* also holds that repudiation "can be either a statement . . . or a *voluntary affirmative act*." 92 N.Y.2d at 463 (1998) (emphasis added).

The Second Circuit has similarly recognized that "[r]epudiation occurs when a party manifests intent not to perform, either by words *or by deeds*." *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 587 (2d Cir. 2005) (emphasis added). Simply stated, New York state and federal courts hold that "a voluntary affirmative act which renders the obligor unable or apparently unable to perform" also constitutes anticipatory breach of contract. *Norcon*, 92 N.Y.2d at 463; *see also Aetna*, 404 F.3d at 588; *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 747 N.Y.S.2d 468, 475 (App. Div. 1st Dept. 2002).

As Sonopress's complaint alleges, MGM has manifested its intent not to perform the Replication Agreement by: 1) stating that it did not intend to place a single order in 2007; 2) giving Sonopress a definite and final communication of its intention not to replicate 120 million DVD units under the terms of the Replication Agreement; 3)

- 14 -

entering into an exclusive multiyear agreement with Cinram in Western Europe, thereby

decimating Sonopress's worldwide territory; and 4) removing thousands of titles of

MGM DVD masters and associated assets from Sonopress's possession, making it

impossible for Sonopress to fulfill any new orders. Compl. ¶ 35. These allegations,

which must be treated as true for the purposes of the motion to dismiss, clearly state a

claim for anticipatory breach of the Replication Agreement, as they show that MGM's

words and deeds: 1) manifest MGM's intent not to perform; and 2) render MGM and/or

Sonopress unable or apparently unable to perform under the contract.

　　　　While MGM will doubtless rejoin that it has not anticipatorily breached because it

has "assured" Sonopress that it will fulfill its obligations and it can do so by exercising its

"option" to pay the Shortfall Amount, such an argument has at least the following two

fundamental flaws. First, when a written demand has been made (as Sonopress

repeatedly did) for "adequate assurances" of future performance, "failure to provide

within a reasonable time not exceeding thirty days such assurance of due performance as

is adequate under the circumstances of the particular case is a repudiation of the

contract." N.Y.-U.C.C. § 2-609 (4).[6] Whether a party has offered "adequate assurance"

is determined according to commercial standards. N.Y.-U.C.C. §2-609(2). MGM's

empty "promise" that it would honor the contract is not an "adequate" assurance, when

MGM's conduct is inconsistent with such a representation (e.g., granting an exclusive to

a competitor in a key portion of Sonopress's territory, acknowledging that it would not

place any orders with Sonopress in 2007 and insisting that Sonopress turn over the MGM

masters and materials to Cinram, so Sonopress will no longer be able to replicate MGM's

---

[6] See Norcon, supra, where the New York Court of Appeals, in response to a certified question from the Court of Appeals for the Second Circuit, extended the right granted by the UCC to demand assurance of future performance (UCC 2-609) to common-law breach of contract cases. 92 N.Y.2d at 467-69.

movies). *See Hornell Brewing Co., Inc. v. Spry*, 664 N.Y.S.2d 698, 703, 1997 N.Y. Slip

Op. 95763 (Sup. Ct. 1997).  Second, saying that one is prepared to pay damages as a

consequence of non-performance is not a substitute for providing assurances that the

contract will be duly performed.

**III.     <u>Plaintiff Has Stated a Claim for Indemnification</u>**

MGM has confused tort law indemnification with contractual indemnification.

The sole case its brief cites, *McDermott v. City of New York*, 50 N.Y.2d 211, 218 (1980),

deals with the statute of limitations for a tort law indemnification action brought against

the manufacturer of an allegedly defective product, and the quoted language is located in

that opinion's footnote 4's dicta describing "a classic indemnity claim".  The parties to a

contract may supplement "classic" indemnification rules with contractual provisions.

*See, e.g.,* Peter A. Hunt, *Structuring Mergers & Acquisitions* ¶27.08 at 651 (3rd Ed.

2007) ("Buyers and sellers will typically indemnify each other for risks assumed or not

assumed, pre-closing and post-closing obligations and breaches of representations and

warranties").

The Replication Agreement between MGM and Sonopress provides this broad

contractual indemnification.  In paragraph 15(b) of the Replication Agreement, MGM

agrees to indemnify Sonopress against "any and all costs, claims, causes of action, suits,

judgments, harm, damages, liabilities, losses and expenses (including, without limitation,

all reasonable legal fees and disbursements)" arising from MGM's "breach of, alleged

breach of, or non-compliance with any of the provisions of this Agreement."  Sonopress,

simply put, faces costs, damages, losses and expenses (including legal fees and costs)

arising from MGM's breach of several provisions of the Replication Agreement.  This

indemnification is squarely within the language of MGM's agreement to indemnify Sonopress.

### IV.    Plaintiff Has Stated a Claim for Declaratory Judgment

As MGM's brief makes clear, the parties have opposing views on issues critical to the parties' legal relations. For example, MGM and Sonopress sharply dispute whether, according to the terms of the Replication Agreement, MGM is required to order 120 million DVD units. In addition, MGM contends that it is entitled to pay only 0.09 Euro per Unit as *satisfaction of its duties* under the contract, while Sonopress contends that MGM must pay *damages*, including but not limited to 0.09 Euro per Unit, *as a consequence of breaching the Replication Agreement*. This Court's determination of these issues is necessary to clarify and settle these legal relations and/or to terminate and afford relief from the uncertainty, insecurity, and controversy caused by the Replication Agreement's ambiguity.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. §2201 (West 2006). Because "'the difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree'" courts generally ask whether the facts alleged "'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Golden v. Zwickler*, 394 U.S. 103, 108 (1969).

Well-established Second Circuit precedent holds that an actual controversy exists – and furthermore, that the court *must* entertain a declaratory judgment action – if either "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" or if the judgment "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992); *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969). "It follows as a general corollary to this rule that if either of these objectives can be achieved the action should be entertained and the failure to do so is error." *Broadview*, 417 F.2d at 1001. *See also Continental*, 977 F.2d at 737 ("If either prong is met, the action must be entertained"); *Kidder Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) (quoting *Broadview*).

In this case, MGM contends that the Replication Agreement allows it to wait 3 ½ years to determine whether it will order Units or pay 0.09 Euro per Unit; Sonopress contends that this course of conduct constitutes breach of the Replication Agreement and will subject MGM to far greater liabilities. The parties to this litigation clearly have adverse legal interests in a substantial controversy, and have a real and immediate dispute regarding their obligations under the contract. Moreover, without this Court's resolution of these disputes, the parties' obligations and remedies under the Replication Agreement will remain unsettled for years. This Court is asked to determine which party's interpretation of the Replication Agreement is correct, and its resolution of this dispute will settle the relations of the parties under the contract, and/or will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding. *See*

*Hummingbird USA, Inc., v. Texas Guaranteed Student Loan Corp.*, No. 06-cv-7672, 2007 WL 163111, at *5 (S.D.N.Y. Jan. 22, 2007).

Courts in this jurisdiction entertain declaratory relief actions where the parties' contract rights are disputed. *See id.*; *Clalit Health Services v. Israel Humanitarian Foundation*, No. 02-cv-6552, 2003 WL 22251329, at *7 (S.D.N.Y. Sept. 30, 2003). They also have found they must entertain an action where a judgment will clarify liability, determine the measure of prospective damages, and "end the uncertainty and insecurity giving rise to this proceeding." (*Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 124 (S.D.N.Y. 1997)). This declaratory action must similarly be entertained by this Court.

**V.    If the Court Grants MGM's Motion to Dismiss, Sonopress
Should Be Allowed to Submit a First Amended Complaint**

Courts in the Second Circuit freely allow leave to file an amended complaint in response to a Fed. R. Civ. P. 12(b)(6) motion to dismiss, and will deny leave to amend as futile only if the proposed amended complaint cannot withstand a 12(b)(6) motion to dismiss. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001); *Kaster v. Modification Systems, Inc.*, 731 F.2d 1014, 1018-19 (2d Cir. 1984). If this Court determines that any portion of Sonopress's complaint should be dismissed, Sonopress respectfully requests leave to file a First Amended Complaint that will incorporate the following facts that Sonopress has learned from MGM's Brief and from Sonopress's continuing investigation of the facts at issue in this litigation:

- The ambiguous provisions of the Replication Agreement that are at issue in this litigation were drafted in whole or in substantial part by MGM. The Agreement furthermore contains no provision that the contract shall be considered to have been drafted by both parties.

- The Replication Agreement was entered into in July 2005.

- 19 -

- At the time that MGM entered into the Replication Agreement, it was a party to exclusive replication agreements in multiple territories, including Western Europe.

- During the negotiation of the Replication Agreement, MGM representatives never informed Sonopress that MGM was a party to exclusive replication agreements.

- MGM and arvato distribution entered into a June 30, 2005 Amendment governing the early termination of the DSA. This Amendment, which was also drafted in whole or in substantial part by MGM, contained the condition precedent that MGM and Sonopress would enter into "a non-exclusive worldwide replication agreement with a volume commitment of no less than 120 million discs."

- It was not the intent of the parties that MGM be granted an option to pay the Shortfall Amount in lieu of ordering the 120,000,000 DVD units. The Shortfall Amount is intended solely for the benefit of arvato distribution for the early termination of the DSA and does not provide any compensation to Sonopress for a failure by MGM to order the requisite number of DVD units.

- MGM's exclusive replication agreement with Cinram covers all of Western Europe.

- Sonopress can not determine how to allocate its replication capacity among its customers and whether it needs to make capital expenditures to meet customer demand if it will not learn until December 31, 2010 whether, when, and how many orders MGM may place for DVD replication by Sonopress.

- 96% of the orders that MGM placed with Sonopress in 2005 and 2006 were for Western Europe.

Inclusion of these facts in an amended complaint would "cure" any deficiency that this Court may find in Sonopress's current complaint, and the amended complaint would withstand Defendant's motion to dismiss. Sonopress also reserves its right to make additional changes to the proposed First Amended Complaint to address, as necessary, any of this Court's findings on the motion to dismiss.

## CONCLUSION

For the foregoing reasons, MGM's motion to dismiss the complaint for failure to state a claim for relief should be denied. Alternatively, Sonopress's conditional cross-motion for leave to file an amended complaint should be granted.

Dated:  July 16, 2007

ALSTON & BIRD LLP

By _____
Alan Kanzer (AK 5839)
Amber C. Wessels (AW 2322)
90 Park Avenue
New York, New York  10016
(212) 210-9400

*Attorneys for Plaintiff*
*Sonopress GmbH*

LEGAL02/30450026v1

- 21 -