UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SONOPRESS GMBH,

           Plaintiff,

     -against-

METRO-GOLDWYN-MAYER HOME
ENTERTAINMENT LLC,

           Defendant.

Civil Action No. 07 Civ 3752 (LTS)

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

O'MELVENY & MYERS LLP

Daniel M. Petrocelli (DP-1467) (*pro hac vice*)
Claudia Ray (CR-4132)
Lee K. Fink (LF-5489) (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendant*
METRO-GOLDWYN-MAYER HOME
ENTERTAINMENT LLC

Dated: August 2, 2007

Defendant Metro-Goldwyn-Mayer Home Entertainment LLC ("MGM"), by its attorneys O'Melveny & Myers LLP, respectfully submits this Reply Memorandum of Law in support of its motion to dismiss the Complaint by Plaintiff Sonopress GmbH's ("Sonopress") in its entirety for failure to state a claim upon which relief may be granted.

## PRELIMINARY STATEMENT

Sonopress's opposition to MGM's motion to dismiss demonstrates the fundamental flaw in its case. Throughout its opposition, Sonopress attempts to argue that the ***non-exclusive*** DVD replication agreement between MGM and Sonopress (the "Sonopress Agreement") gives it rights that are nowhere to be found in the contract, and for which it never bargained.

The Sonopress Agreement is clear and unambiguous. By its own terms, it is non-exclusive, entitling MGM to enter into replication agreements with any other DVD replicator, anywhere in the world. That MGM entered into agreements with other replicators does not give rise to a claim for damages by Sonopress. Sonopress's attempts to turn its ***non-exclusive*** replication agreement into an *exclusive* agreement must be rejected. Sonopress is attempting to re-write the contract in litigation, as made clear by the fact that its opposition repeatedly relies on authority regarding breaches of *exclusive* agreements to bolster its unsupportable arguments. The Court simply cannot grant to Sonopress contractual rights for which it did not bargain.

The Sonopress Agreement guarantees only that MGM will ***either*** (i) order up to 120 million DVD units from Sonopress or, (ii) at its option, pay Sonopress €0.09 for each unit less than 120 million that it orders. MGM has repeatedly indicated that it will fulfill its commitment, yet Sonopress still brings this action for anticipatory repudiation. In its Opposition, Sonopress argues that this provision is not an option, but rather a liquidated damages clause. Yet nowhere does the contract refer to the Shortfall Amount as damages, nor does it contain a typical and

easily drafted liquidated damages clause.  This argument is just another attempt by Sonopress to change the clear terms of the contract, and should not be countenanced by the Court.

Finally, Sonopress tries to argue that the indemnification provision of the Sonopress Agreement is really meant to be an attorneys fees provision.  Once again, Sonopress argues that the clear language in the contract gives it rights for which it never bargained.  There is no attorneys fee provision in the contract, and the indemnification provision unambiguously deals only with actions brought by *third parties*—not Sonopress's *own* complaint.

I.  **SONOPRESS DOES NOT STATE A CLAIM FOR BREACH OF CONTRACT**

    A.  **MGM Did Not Breach The Non-Exclusive Agreement With Sonopress By Entering Into The Replication Agreement With Cinram**

The fundamental flaw with Sonopress's case is its contention that MGM breached the Sonopress Agreement by entering into a replication agreement for Western Europe with Cinram.  A party cannot breach a non-exclusive agreement by entering into an agreement for the same services with another party.  Such a rule would essentially convert the non-exclusive agreement for which Sonopress bargained into an exclusive agreement to which it is not entitled.

*Silverman v. Carvel Corp.*, 8 A.D. 3d 469, 778 N.Y.S.2d 515 (2004), which MGM cited in its moving papers, supports this proposition.  Sonopress's attempt to distinguish the case completely misses the point.  In *Silverman*, a Carvel franchisee held the exclusive rights to operate a Carvel franchise within a certain geographic area, and the non-exclusive rights to sell pre-packaged Carvel products in that same territory.  The franchisee claimed that Carvel had breached the franchising agreement by allowing supermarkets and convenience stores in its territory to sell pre-packaged Carvel products.  Sonopress argues that the case is not applicable because there was no claim that Carvel had infringed on the franchisee's exclusive territory.  But Sonopress misunderstands the case.  Sonopress focuses only on the exclusive rights, ignoring the

2

court's holding that Carvel did not violate the franchisee's non-exclusive rights by allowing competitors to sell pre-packaged Carvel products in the same territory. *Id.*

Indeed, none of the cases that Sonopress cites support its position. Each of the cases that Sonpress cites addresses instances where there is a breach of an *exclusive* contract—not a ***non-exclusive*** contract such as the one at issue here. For example, in *United Liquors, Inc. v. Carillon Importers, Ltd.*, 893 F.2d 1, 2 (1st Cir. 1989), the court noted only that an importer had terminiated its distributor's exclusivity by allowing another distributor to sell the same products in the same territory. But *United Liquors* says nothing about the breach of a ***non-exclusive*** agreement. *Fen-Hin Chon Enterprises, Ltd. v. Porelon, Inc.*, 874 F.2d 1107, 1109 (6th Cir. 1989), similarly deals only with the breach of an *exclusive* contract, where an exclusive licensee sued its licensor for providing the subject technology to a competitor in the licensee's territory.

Sonopress also relies on *Graphic Technology, Inc. v. Pitney Bowes, Inc*, 968 F. Supp. 602, 606 (D. Kan. 1997), to support its position. But Sonopress cites not to the court's reasoning, but rather to the court's restatement of plaintiff's allegations that a company had breached an exclusive license by virtue of having granted to another party a non-exclusive license for the same technology. *Id.* at 605-606. Even if the case there had dealt with the question of what constitutes a breach of a non-exclusive contract, the court never actually reached the issue, holding that the claim was barred by the statute of limitations. *Id.* at 607.

Only *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831 (5th Cir. 2001), which MGM cited in its moving papers, deals with a breach of a *non-exclusive* license.[1] There, the

---

[1] Sonopress also cites *Board of Regents of the University of Nebraska v. BASF Corp.*, No. 4:04 CV 3365, 2006 WL 2583253 (Sept. 6, 2006), which deals with a non-exclusive license, but it is a ruling on a party's right to intervene, not a ruling on the merits of a breach of a non-exclusive contract. The court there found only that a non-exclusive licensee could intervene in a declaratory judgment action by an alleged exclusive licensee because the "'disposition of the action may as a practical matter impair or impede [the non-exclusive licensee's] ability to protect that interest.'" *Id.* at * 3 (citing Fed. R. Civ. P. 24(a)) (emphasis added). There was no ruling on the actual merits.

3

court found that a world-wide exclusive contract could not be reconciled with a world-wide non-exclusive contract for the same technology. *Id.* at 841. That case is not applicable here because there, the plaintiff was left with *no* territory in which to exercise its licensed rights. Here, in contrast, notwithstanding MGM's exclusive contract with Cinram for Western Europe, Sonopress still has substantial territories in which it may replicate DVDs for MGM.[2]

There is another critical distinction between the license agreements at issue in *Dresser-Rand* and the other cases cited by Sonopress and the Sonopress Agreement at issue here. The value of a license agreement arises from the grant of rights to exploit the licensed property. In contrast, under a replication agreement such as the Sonopress Agreement income is generated by filling orders placed by the commissioning party. (*See* Sonopress Agreement ¶ 8 ("commencement of production runs will commence on receipt by Sonopress of authorized MGM Workable Orders").) Thus, while an exclusive replication agreement would require a company to place all of its DVD replication orders with a particular company, a non-exclusive replication agreement merely allows a studio such as MGM to place orders with a replicator. Since MGM would always control the territories for which it allows companies to replicate DVDs, a breach could only happen, if at all, if MGM were to cut Sonopress out of *all* possible territories. Since Sonopress is still able to replicate DVDs in numerous territories other than Western Europe, there is no breach of the Agreement. *Cf. Integrated Micro Systems, Inc. v. NEC Home Electronics (USA), Inc.*, 174 Ga. App. 197, 200, 329 S.E.2d 554, 557 (1985) (holding that a non-exclusive dealer agreement was not breached when the supplier appointed one of plaintiff's large customers as a dealer). Thus, the claim for breach of contract must be dismissed.

---

[2] Sonopress suggests that MGM's footnote pointing out that Sonopress knew that MGM had exclusive agreements in other territories—a fact known to all parties—might convert this to a summary judgment motion. It does not. MGM relies only on the facts alleged by Sonopress. But even from the face of the Complaint, it is clear that Sonopress knew that MGM frequently entered into exclusive agreements in certain territories. (*See, e.g.* compl. ¶ 8.)

B.  **MGM Can Pay The Shortfall Amount As An Alternative Means Of Performance**

Sonopress argues that MGM breached the Sonopress Agreement by not ordering the full 120 million DVD units called for in the Sonopress Agreement. While Sonopress's claim is premature, it is also misplaced. The Sonopress Agreement explicitly states that MGM has the option of paying a "Shortfall Amount" of €0.09 for each DVD unit less than 120 million units that it orders. (Decl. of Claudia Ray, Ex. A (the "Sonopress Agreement") at ¶ 2).[3]

Sonopress claims that that the Shortfall Amount is a liquidated damages clause. But once again, Sonopress is at attempting to re-write the unambiguous language of the contract to grant itself rights that it does not have. Nowhere does the Sonopress Agreement refer to the Shortfall Amount as a liquidated damages provision. Indeed, the contract has a *separate* clause which limits either party's damages to €500,000 per contract year. (Sonopress Agreement ¶ 15(d).)[4]

Nor does *Bradford v. New York Times Co.*, 501 F.2d 51 (2d Cir. 1974), support Sonopress's position. As MGM pointed out in its moving papers, the court in *Bradford* stated that a contract may "truly provide one of the parties the alternative of one performance or another." *Id.* at 56. Sonopress relies on the fact that the court in *Bradford* found there was no alternative means of performance in that case, while ignoring the critical, outcome-determinative differences between the contract at issue in *Bradford* and the Sonopress Agreement.

In *Bradford*, a former *New York Times* employee participated in a retirement plan by which he agreed not to engage in any business in competition with the *Times*. *Id.* at 54. The retirement plan stated that in "the event of any breach" of the agreement, the *Times* could

---

[3] The Ray Declaration was submitted in conjunction with MGM's moving papers.

[4] Amazingly, Sonopress claims that it is only *one* form of damages, and argues that it can seek the Shortfall Amount plus additional damages—all in excess of the express €500,000 per year damages limit set forth at paragraph 15(d0 of the Sonopress Agreement. (Ray Decl. Ex. A.)

5

discontinue his retirement payments. As the court noted, however, the contract did not provide any alternative means of performance for the employee (either forebear from competing with the *Times* or give up his retirement payment). *Id.* at 56. Instead, it simply prohibited the employee from competing with the *Times*. *Id.* The contract there also provided that the company could stop paying the retirement payment in "the event of any breach" of the agreement. *Id.* at 54 (quoting from the contract). "[T]he absence of the use of the term 'option'" was a factor in the court's determination that there was no alternative means of performance provided. *Id.* at 56 n.2.

Here, in contrast, if MGM does not order the full 120 million DVD units, the Sonopress Agreement specifically states that "MGM shall have the ***option*** either (a) to pay the Shortfall Amount to Sonopress, or (b) to extend the Term . . . ." (Agreement ¶ 2 (emphasis added).) The Agreement never refers to the Shortfall Amount as required due to any breach by MGM, but merely a defined amount that Sonopress will receive in the event MGM does not order, and Sonopress does not replicate, the entire 120 million units.

Sonopress's argument that the Shortfall Amount is only a "pass-through" to arvato, and therefore not an alternative means of performance, is similarly meritless. The Sonopress Agreement clearly serves as a novation of the Arvato Agreement. *Callanan Industries, Inc. v. Micheli Contracting Corp.*, 124 A.D.2d 960, 962, 508 N.Y.S.2d 711, 712 (1986) ("A novation has four elements, each of which must be present in order to demonstrate novation: (1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract."); *see also May Dept. Stores Co. v. International Leasing Corp., Inc.*, 1 F.3d 138, 140 (2d Cir. 1993) ("a novation: an agreement for an existing obligation to be extinguished immediately by the acceptance of a new promise.")

Here, there is no doubt that the purpose of the transaction that gave birth to the Sonopress Agreement was to extinguish MGM's obligations under the Arvato Agreement—indeed, the amendment which Sonopress references specifically states that arvato "agreed to permit MGM to terminate the [Arvato Agreement] early on the condition that MGM enter into" the Sonopress Agreement. (Declaration of Lee Fink, Ex. 1 [the "Arvato Amendment"] at 1.) When it entered into the Arvato Amendment, arvato relinquished its rights against MGM. *See Restatement (Second) of Contracts* § 280, cmt. b ("A novation discharges the original duty, just as any other substituted contract does, so that breach of the new duty gives no right of action on the old duty.") Sonopress cannot now complain that it should be able to receive (on behalf of arvato) compensation for the early termination of the Arvato Agreement. Sonopress (and arvato) received exactly what it bargained for—a promise by MGM to pay €10.8 Million, either through premium on DVDs that it orders or, alternatively, through payment of the Shortfall Amount.

Sonopress does not dispute that *Hasbrouk v. Van Winkle*, 261 A.D. 679, 682 27 N.Y.S.2d 72, 27 (1941), specifically recognizes that contracts allowing a party to either perform a certain act or pay an agreed-upon sum of money are permitted under New York law. Instead, Sonopress claims, in a footnote, that even though the *Bradford* court cited *Hasbrouk* approvingly, it is "highly distinguishable opinion," without ever explaining why. Instead, Sonopress merely asserts that contracts dealing with real property "are frequently governed by different rules of law," without explaining what principles are different in the present case. In fact, there are none.

Sonopress lastly argues that that Sonopress Agreement is ambiguous, and not suitable for determination on a motion to dismiss, because each side has proffered different interpretations. The problem with Sonopress's position is that here, "intent is unambiguous from the four corners of the" Agreement. (Opp. at 12.) Even given the facts alleged by Sonopress, the parties were

7

well aware at the time they entered into the Sonopress Agreement that MGM might not order 120 million DVD units.  The only assurance in the Agreement was that MGM would pay €10.8 million for the early termination of the arvato services agreement—either through a €0.09 premium on each DVD unit that MGM purchased from Sonopress, or through paying the Shortfall Amount of €0.09 per each DVD unit less than the commitment of 120 million DVD units.  The Shortfall Amount was clearly an alternative means of performance whereby MGM could satisfy its obligations under the Sonopress Agreement.  See *Hasbrouck v. Van Winkle*, 261 A.D. 679, 682, 27 N.Y.S.2d 72, 76 (1941) ("the agreement of the promisor is to do a certain thing or in default thereof to pay a certain sum of money . . . is considered as giving the promisor the election to refuse to do the act and in lieu thereof to pay the amount agreed.")  Sonopress's claim for breach of contract fails for this reason as well.

        **C.**      **MGM Did Not Commit Anticipatory Repudiation Of The Agreement**

Sonopress offers four arguments in support of its claim that MGM committed anticipatory repudiation of the Sonopress Agreement, none of which is sufficient to state its claim.  (Opp. at 14.)  Sonopress's allegation that MGM indicated that it did not intend to place a single order in 2007 is insufficient because the Sonopress Agreement—which requires only that MGM provide to Sonopress a projected volume for a rolling six-month period—has a term of five (or, at MGM's option) six years.  (Sonopress Agrement ¶ 4(c).)  The fact that MGM does not intend to order DVD units during a particular six-month period is inconsequential.

Second, Sonopress's conclusory allegation in its opposition papers that MGM gave "Sonopress a definite and final communication of MGM's intention not to replicate 120 million DVD units" contradicts its own admission in the Complaint that MGM informed Sonopress that it was "committed to fulfilling its obligations under the Agreement."  (Compl. ¶ 22.)

Third, Sonopress's allegation that MGM breached the contract by entering into an exclusive agreement for DVD replication services in Western Europe simply does not constitute a repudiation because MGM has every right to enter into other replication agreements since the Agreement here is explicitly **non-exclusive**. *Silverman*, 8 A.D. 3d at 469, 778 N.Y.S.2d at 515.

Finally, Sonopress's allegation that MGM committed anticipatory repudiation because it removed the masters that Sonopress uses to replicate DVDs is simply a red herring. As explained above, unlike a license agreement, the Sonopress Agreement only allows Sonopress to replicate DVD units which MGM orders. (*See* Sonopress Agreement ¶ 16.) Since video masters vary from country-to-country, they are only useful to Sonopress once MGM has placed an order. Sonopress's claim for anticipatory breach must also be dismissed.

## II. SONOPRESS'S COMPLAINT DOES NOT STATE A CLAIM FOR INDEMNIFICATION

In its indemnification claim, Sonopresss once again argues that the Agreement gives it rights for which it never bargained. In essence, Sonopress is attempting to turn the indemnification provisions of the Agreement into an attorneys fees provision.

In its motion to dismiss, MGM pointed out that a "classic" claim for indemnification exists only when a party is held liable for the actions of a third party. McDermott v. City of New York, 50 N.Y.2d 211, 218, 428 N.Y.S.2d 643, 647 n.4 (1980); *Restatement (First) of Restitution* § 76. Although Sonopress is correct that a contract *may* supplement a "classic" indemnity claim, there is nothing in the contract that actually creates any additional obligations on the part of MGM beyond a "classic" indemnity arising from a third-party claim. The Sonopress Agreement sets forth the obligation of the indemnitee to inform the other party, and the obligation of the indemnitor to undertake the costs of the defense (Agreement ¶ 15(c)) but nothing more. Obviously, Sonopress has not tendered its defense to MGM. Equally obviously, there is no

9

claim against Sonopress by any third party. Rather, Sonopress is simply attempting to collect its **own** attorneys fees in bringing this claim. Such expenses are not recoverable "[u]nless authorized by specific statutory or contractual provision[]. . . ." *Cruz v. Local Union No. 3 of Intern. Broth. of Elec. Workers*, 34 F.3d 1148, 1158 (2d Cir. 1994). Given the absence of any such language in the Sonopress Agreement, this claim must also fail.

### III.  SONOPRESS DOES NOT STATE A CLAIM FOR DECLARATORY RELIEF

Both parties agree that an action for declaratory relief is only proper where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (Opp. at 17 (citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969).) The difference between the parties here is whether there is such immediacy. If Sonopress's breach of contract claim fails, as MGM argues that it must, then there is no controversy and Sonopress is seeking merely a clarification of the parties' rights. Any such decision by this Court would be an improper advisory opinion, and thus the declaratory judgment cause of action should be also dismissed.

### IV.  SONOPRESS COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

In conjunction with its opposition to MGM's motion to dismiss, Sonopress has filed a conditional motion for leave to file an amended complaint. As set forth in detail in MGM's opposition to that motion, which is incorporated herein by reference, none of the new facts alleged in the proposed amended complaint would change the analysis set forth herein. Thus, Sonopress's amended complaint would be futile, and should be denied. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).

### CONCLUSION

For the reasons set forth above, and in MGM's Memorandum of Law in Support of its motion to dismiss, Sonopress's complaint should be dismissed with prejudice.

Dated: August 2, 2007

                                          Respectfully submitted:

                                          O'MELVENY & MYERS LLP

                                          _____
                                          Daniel M. Petrocelli (DP-1467)
                                          Claudia Ray (CR-4132)
                                          Lee K. Fink (LF-5489)
                                          Times Square Tower
                                          7 Times Square
                                          New York, New York 10036
                                          Telephone:  (212) 326-2000
                                          Facsimile:  (212) 326-2061

                                          *Attorneys for Defendant*
                                          METRO-GOLDWYN-MAYER HOME
                                          ENTERTAINMENT LLC

CC1:767949